**SUNDANCE CRUISES CORP. and SCI Cruises, Inc., formerly known as Sundance Cruises, Inc., Plaintiffs,**

v.

**The AMERICAN BUREAU OF SHIPPING, Defendant.**

**No. 87 Civ. 0819 (WK).**

United States District Court, S.D. New York.

July 31, 1992.

Opinion on Motion for Reargument Sept. 18, 1992.

---

Brian D. Starer, Steven A. Candito, Haight, Gardner, Poor & Havens, New York City, for plaintiffs.

John J. Loflin, John E. Grimmer, Elizabeth L. Humphreys, Peter A. Cal, Jennifer

A. Mangino, Lord Day & Lord, Barrett Smith, New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, District Judge.

This action is between plaintiff Sundance Cruises Corp. (hereinafter "plaintiff"),[1] the owner of the M/V Sundancer, a ship that flew the flag of the Bahamas, and defendant American Bureau of Shipping (hereinafter "defendant"), a classification society in the business of issuing classification and safety certificates on behalf of itself and the countries by which it is authorized so to do. On June 14, 1984 it issued various safety certificates regarding the vessel. On June 29 the Sundancer ran aground and sank off the coast of British Columbia. Although plaintiff acknowledges responsibility for the ship's running aground, it contends that the ship would not have sunk but for defendant's negligence, gross negligence, negligent misrepresentation, breach of contract, and breach of implied warranty of workmanlike performance in issuing the relevant certificates. Defendant moves for summary judgment on a variety of interconnected theories.

## BACKGROUND [2]

On January 19, 1984 the plaintiff, a Panamanian corporation jointly owned by Seattle-based McDonald Enterprises (50%), Johnson Line of Sweden (25%), and EFFOA of Finland (25%), purchased from Johnson Line the SVEA CORONA, a passenger car ferry then operating in the Baltic Sea between Sweden and Finland. Pl. Aff. ¶ 10. Plaintiff planned to convert the SVEA CORONA into a luxury passenger cruise ship to be operated during the summer months along the west coast of North America

from Vancouver to Alaska and in the winter from Los Angeles to Mexico. To that end it bid out conversion specifications outlining the planned changes. It ultimately awarded a Swedish consortium consisting of the Oskarsham Varv shipyard, contractor Skanska/IMS, and naval architects Von Tell Nico the contract to design the plans for and perform the substantial conversion.[3] Pl. 3(g) at III, ¶¶ 2, 6; Pl.Aff. ¶ 34; Pl.Aff.Exh. 25; Def. Exhs. 5, 20.

### The Contract Between Plaintiff and Defendant

On March 5, 1984 plaintiff and defendant entered into a Request for Classification Survey and Agreement (hereinafter the "Agreement") that, *inter alia,* called upon defendant to survey the vessel according to its own rules and according to the regulations set forth in the SOLAS and Load Line conventions, and to issue classification and statutory safety certificates signalling compliance with those rules and regulations. Pl.Exh. 4; Pl. 3(g) at II. The Agreement was signed on behalf of plaintiff by one Lars Sjogren, the head of Johnson Lines, the company that was to manage the vessel. Immediately above the Agreement's signature lines is a clause in bold capitals stating:

**THE UNDERSIGNED PARTIES ACKNOWLEDGE THAT ALL OF THE TERMS AND CONDITIONS CONTAINED IN PAGES 1 THROUGH 4 HAVE BEEN REVIEWED AND THAT UNLESS OTHERWISE MUTUALLY AGREED IN WRITING, OR REQUIRED BY LAW, ALL SERVICES RENDERED IN CONNECTION WITH THIS REQUEST ARE GOVERNED BY**

---

**1.** An entity known as SCI Cruises, Inc., formerly known as Sundance Cruises, Inc., the vessel's operator, is also named as a plaintiff. We shall follow plaintiff's practice of treating the matter as if Sundance were the only plaintiff, and shall not again mention SCI Cruises, Inc.

**2.** In setting forth the factual background we draw all reasonable inferences and resolve any ambiguities in favor of plaintiff, the non-moving party. *See Rattner v. Netburn* (2d Cir.1991) 930 F.2d 204, 209 (*citing Anderson v. Liberty Lobby,*

*Inc.* (1986) 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202.)

**3.** The parties dispute whether the conversion involved "modifications of a major character" rather than a large job that was nonetheless not "of a major character." Apparently, different and presumably more stringent standards would be applied to the former type of conversion than to the latter. For present purposes we assume the conversion to have been "of a major character."

THE TERMS AND CONDITIONS CONTAINED THEREIN.

Term 2 of the Agreement concerns fees, and states in part that "(a) All fees and payments shall be determined in accordance with normal ABS [defendant] practices and quoted to the client in a separate letter." Term 13 appears in bold capitals:

### 13. LIMITATION

**ABS MAKES NO REPRESENTATIONS BEYOND THOSE CONTAINED IN ARTICLES 11 AND 12 HEREOF REGARDING ITS REPORTS, STATEMENTS, PLAN REVIEW, SURVEYS, CERTIFICATES OR OTHER SERVICES.**

Term 11, which is entitled "CLASSIFICATION," warns in part:

> in no way should classification, issuance of certificates or performance of services be deemed to be a representation, statement or warranty of seaworthiness, structural integrity, quality or fitness for a particular use of service, of any vessel, structure, item of material, equipment or machinery beyond the representation contained in the Rules of the ABS.

while Term 12, **"RESPONSIBILITY AND LIABILITY,"** declares in part:

> The validity, applicability and interpretation of a certificate issued under the terms of or in contemplation of this Agreement is governed by the Rules and standards of American Bureau of Shipping who shall remain the sole judge thereof. Nothing contained herein or in such a certificate or in any report issued in contemplation of such a certificate shall be deemed to relieve any designer, builder, owner, manufacturer, seller, supplier, repairer, operator or other entity of any warranty express or implied.

Finally, Term 14 is a Hold Harmless clause that reads in part:

> the party requesting classification hereunder ... agrees to indemnify and hold harmless ABS from and against any and all claims ... including legal fees ... which may be brought against ABS incidental to, arising out of or in connection with the work to be done ... except for those claims caused solely and completely by the negligence of ABS.

The above-quoted **"Classification"** Term 11 makes reference to defendant's *Rules for Building and Classing Steel Vessels* (1983). Rule 1.3 of those rules, entitled "Representation as to Classification," reads in part:

> The Rules of the American Bureau of Shipping are not meant as a substitute for the independent judgment of professional designers, naval architects and marine engineers, nor as a substitute for the quality control procedures of shipbuilders....
>
> The Bureau represents solely to the vessel Owner or client of the Bureau that it will use due diligence in the development of Rules, Guides and standards ... The Bureau further represents to the vessel Owner or other client of the Bureau that its certificates and reports evidence compliance only with one or more of the Rules, Guides, standards or other criteria of the Bureau in accordance with the terms of such certificate or report.

Rule 1.4, entitled "Responsibility and Liability," essentially repeats above-quoted Term 12. Rule 1.25, entitled "Responsibility," reads:

> The Bureau [defendant], being a technical society, can act only through Surveyors or others who are believed by it to be skilled and competent. It is understood and agreed by all who avail themselves in any way of the services of the Bureau that *neither the Bureau nor any of its Committees and employees will, under any circumstances whatever, be responsible or liable in any respect for any act or omission, whether negligent or otherwise, of its Surveyors, agents, employees, officers or Committees, nor for any inaccuracy or omission in the Record or any or the publication of the Bureau, or in any report, certificate or other document issued by the Bureau, its Surveyors, agents, employees or Committees.*

(Emphasis added).

Finally, Rule 45.1.10 provides:

No alterations which affect or may affect classification or the assignment of load lines are to be made to the hull or machinery of a classed vessel unless plans of the proposed alterations are submitted and approved by the committee before the work of alterations is commenced and such work, when approved, is carried out to the satisfaction of the Surveyor.

Additionally, attached to the Agreement is an Application for Load Lines, immediately above the date and signature line of which application is a release clause that—substantially a condensation of the emphasized portion of the above-quoted Rule 1.25—states:

It is understood and agreed that neither the Bureau nor any of its Committees is under any circumstances whatever to be held responsible for any inaccuracy in any report or certificate issued by the Bureau or its Surveyors or in any entry in the Record or other publication of the Bureau or for any errors of judgment, default or negligence of its Officers, Surveyors or Agents.

While there is no choice of laws clause in the Agreement itself, plaintiff has presented us with a total of seven invoices it had received from defendant in connection with the work performed under the Agreement, on the reverse side of each of which is a series of Terms and Conditions that "unless otherwise mutually agreed in writing" would govern "all services rendered and certificates issued in connection with th[e] invoice." The last of these Terms and Conditions reads in part as follows:

### 15. GOVERNING LAW

The validity, interpretation and performance hereof shall be governed by the laws of the State of New York.

The parties hereto agree to the submit to the jurisdiction of the United States District Court for the Southern District of New York, and/or the Courts of the State of New York, any claim or dispute arising under this Invoice.

Three of these invoices had approval stamps pasted over their Terms and Conditions sides that had been initialled by Lars Sjogren, who had signed the Agreement on plaintiff's behalf. Two others had been similarly initialled by an otherwise unidentified Johnson Ships superintendent. Upon examining the original invoices, which were first retrieved from Sweden and introduced into this litigation in early June 1992, we saw that the "approval stamp" is a white rectangle of paper pasted to the Terms and Conditions side of the invoice. On each of the three invoices on which Sjogren's initials appear, the stamp obscures more than 90% of the above-quoted law selection clause as shown below:

Subsequent to oral argument on the motion—upon plaintiff's representation that Sjogren might not be available at a later date—we ordered that plaintiff could take his videotape deposition for use at trial. At that deposition he testified that the Johnson Line practice with respect to invoices was for the financial department to affix an approval stamp on the invoice (either on the front or the reverse thereof) and send it to an appropriate person for his or her initials, which would signify approval for payment. He further testified that it was his normal business practice to review invoices for amounts exceeding Sw.Kr. 100,000, and that he customarily familiarized himself with the terms and conditions placed on such invoices. However, in this particular case he never became aware that such Terms and Conditions were any different from those set forth in the original Agreement. *See* Sjogren Tr. at 51.

### Conversion, Survey, Certification, and Casualty

The conversion of the SVEA CORONA to the luxury passenger ship M/V Sundancer commenced in early February, 1984. It involved substantially increasing the amenities, number of passenger cabins, food preparation and storage capacity, air conditioning, waste disposal, etc. Pl.Aff.Exh. 25.

Defendant was required to inspect the vessel before issuing certificates. With respect to the requirements of SOLAS and Class inspections, William A. Cleary, one of plaintiff's expert witnesses, stated that (Pl. Rearg.App.Exh. 3 at 15):

the Subdivision aspects of SOLAS require [inspection to verify the watertight integrity of] ALL watertight bulkheads, at all levels up to the bulkhead deck, all longitudinal bulkheads, many sections of deck, all piping and electrical connections through watertight bulkheads and decks, following piping to be certain they are fully connected to closed systems, etc.

This inspection, he averred, is the duty of the surveyor.

Cleary also stated that the general plan review that must be completed prior to the issuance of SOLAS and Load Lines certificates required defendant to review a vast number of design plans, specifically including those concerning "full machinery and piping review with emphasis on changes [and] Watertight Subdivision Arrangement and Details (including bulkhead integrity and flooding)." *Id.* at 13.

The field surveyor defendant assigned to the project was one Dick Nilsson. He has a degree in marine engineering and a chief engineer's license, and had been a marine engineer for 13 years before joining defendant as a surveyor in 1973. Pl.Rearg.App. Exh. 50. He had had very little experience surveying passenger ships before starting on the Sundancer. Nilsson Tr. at 76–78. He was at the site for much of the conversion from March 9 to May 8, 1984, and aboard the vessel from May 28 to June 16. He devoted additional weeks before, during, and after those periods to paperwork involving the Sundancer. *See* Nilsson time sheets, Pl.Exh. 60.

As part of the survey process, defendant required plaintiff to provide for its review complete sets of drawings for the vessel. Berndt Gabrielsson, a Johnson Line naval architect, acted for plaintiff in reviewing "technical facts" and collecting the "drawings" related to the conversion. He testified that, at a January 22, 1984 meeting attended by the parties and members of the consortium converting the vessel, one of defendant's representatives asked for the drawings "as soon as possible." Pl.Rearg. App.Exh. 30 at 84. At a March 1, 1984 meeting attended by many of the same persons, defendant's representatives reiterated this demand and formally presented to plaintiff's naval architects Von Tell Nico its T–8–2 letter listing six pages of "Plans Required for SOLAS 1974 Review on Passenger Ships." Def.Exh. 10; Pl.Exh. 42; Pl.Rearg.Aff. ¶ 234.

Among the plans explicitly requested in that letter were those for "sanitary piping

and similar systems," which included the Grey Water Piping System[4] and the Starboard Galley Drain. Plaintiff has indicated that some 600–700 plans were provided to defendant in response to these requests. However, both parties agree that no plans for the Grey Water Piping System—either as it existed in 1984 or when the vessel was first built in 1974[5]—or the Starboard Galley Drain were ever provided to defendant. (Hearing Tr. at 90–92, 96, 103–04). In a May 21, 1984 Telex Von Tell Nico stated to defendant that "we believe that all listed drawings are now submitted from here or from Johnson Line." Pl.Aff.Exh. 40.

On May 8, the Sundancer set sail from the Oskarsham yard to Miami, Florida carrying no passengers, but having on board a working crew of some 30–50 to complete some conversion jobs. Def.Aff. ¶ 16. The vessel—with no public passengers but a similar working crew—then sailed from Miami to Panama, Acapulco, Puerto Vallarta, Los Angeles, and San Francisco, and ultimately arrived on June 14 in Vancouver, from which port the first public cruise departed on June 16. The inspections that preceded defendant's issuance of the SOLAS, Load Lines, and classification certificates took place from May 28 through June 14 either at the Oskarsham yard or on board the vessel during its voyages.

Nilsson issued a one-month cargo ship safety certificate on May 8, 1984 when the vessel left the Oskarsham shipyard (Pl. Exh. 49), and subsequently issued a series of one-voyage provisional certificates so that the Sundancer could travel from Mexico to Vancouver via Los Angeles and San Francisco. Pl.Aff.Exh. 57. On June 12,

Captain Berquist, the vessel's master, telexed Johnson Lines, stating that "we have now reached a point when neither I nor my crew can handle the situation any longer if no further steps are taken. I intend to stay in port in Vancouver until the building of my ship has been completed so that at least it complies with the SOLAS security regulations." PTO Exh. 512. As a result of this Telex, Sjogren flew to Vancouver and contracted with a local shipyard to complete the outstanding work, whereupon Nilsson on June 14, 1984 issued five-month provisional Load Line and SOLAS certificates. Berquist Tr. 208–11; Pl.Aff.Exh. 58. On June 21 one of defendant's employees noticed that the Interim Class Certificate, which should have been issued simultaneously with the Load Line and SOLAS certificates, had not been so issued. Nilsson on that day issued such certificate, backdating it to match the June 14 date on the others. Pl.Exhs. 47, 59.

The statutory safety certificates (SOLAS and Load Lines) are necessary to allow a shipowner operate its ship "worldwide" (Hearing Tr. at 41), and "to trade in the world" (Hearing Tr. at 83). See also Pl. Opp.Mem. at 66 (refusal to issue certificates "would mean that the vessel could not be insured or allowed to carry passengers"). The classification certificate enables the shipowner to procure insurance: "He needs that because he cannot get hull insurance, P. & I. insurance [without it]" (Hearing Tr. at 81). See also Tr. at 82–83; Pl.Supp.Exh. 2 (ABS Company Profile notes, inter alia that classification can result in lower insurance premiums, satisfy jurisdictional requirements, and give owner

---

**4.** A Grey Water Piping System would carry drainage from showers or sinks, for example, as opposed to sewage or fresh water.

**5.** We accept the recitation of the history of the ship's Grey Water Piping System plans given by defendant's counsel at the April 3, 1992 hearing insofar as it is uncontradicted. Evidently, the ship was originally equipped with Grey Water Piping that met with SOLAS requirements and plans for that system exist. A 1976 modification to the system eliminated certain essential non-return valves and transformed the system into one violative of SOLAS requirements. A plan consisting of four drawings apparently reflects on one of the sheets (No. 4) some, but not all, of the 1976 modifications, and a one-line notation on a different sheet (No. 3) dated July 13, 1976 reflects the addition of a waste pipe. However, since we are entirely unequipped to determine from the plan whether the violative piping system is in fact rendered thereon, or whether the July 1976 notation refers to the modified and violative piping system, we will assume for the purposes of this motion that the plan so reflects the changes and could have been—but was not—sent to defendant. It is, however, undisputed that no plans for the Starboard Galley Drain ever existed.

"peace of mind"); Berquist Testimony Tr. at 36 (classification certificate necessary for insurance).

The fee paid for the surveys and other services defendant performed incident to issuing the certificates was $85,000. Def. Exh. 12. Plaintiff, which purchased the ship for $18 million and converted it at the cost of approximately $10 million, now seeks compensatory damages in excess of $64 million and punitive damages of $200 million. Pl.Exh. 1; Def.Exh. 18; Amended Compl.

Fifteen days after receiving its certificates, four minutes before midnight on its third voyage from Vancouver to Alaska (six hours and 41 minutes after setting sail), the M/V Sundancer ran aground on Maud Island in the Seymour Narrows of the Discovery Passage off the coast of British Columbia. Captain Berquist had retaken control of the ship from the Canadian pilot moments before the grounding when he had observed the pilot order the ship toward Maud Island. Captain Berquist's evasionary tactics, however, were too late, and the Sundancer struck bottom, tearing a hole into it's hull. By 12:07 a.m. Captain Berquist had guided the ship to an anchorage in a nearby bay, and damage assessment was in progress. By 12:09 the lower deck had been evacuated and all watertight doors closed, except for one, which had been wedged open by a piece of wood. One minute later the bilge pumps were started. Captain Berquist raised anchor and sailed for Duncan Bay at 1:04, tying up at a paper mill's dock at 1:20, at which time the Canadian Coast Guard provided the crew with three additional pumps. Passenger evacuation began at 2:12, and within one-half hour over 500 persons had left the ship.

Although no lives were lost, the evacuation was not without incident. Toward its end, the listing of the ship became so extreme that the gangplank which had connected the ship to the dock broke loose and fell into the Bay. Some passengers then escaped the vessel by jumping into the water and others by climbing down ropes that were hanging over the side. Several were injured seriously enough to require hospitalization. Pl.Rearg.Reply Aff. ¶ 16; Def.Rearg.Opp.Aff. ¶ 3. Captain Berquist, the last person to leave the Sundancer, went ashore at 4:30 a.m. After everyone had been evacuated, the ship settled onto the seabed, and when the tide changed, its weight broke up the dock. *See generally* PTO Exh. 1233, Berquist Tr. at 82–121, Pl.Rearg.App.Exh. 1 at 23–25.

It is plaintiff's claim that the proximate causes of the sinking were defects compromising the vessel's watertight integrity, and that these were not detected by defendant's survey and plan review. The parties agree that neither Nilsson nor other representative of defendant discovered or reported to plaintiff the existence of these defects. Specifically, defendant never reported either the defective and violative Grey Water Piping System or Starboard Galley Drain—which lacked non-return valves designed to prevent progressive flooding from a compromised watertight compartment to a secure one—or the existence of "the holes"—a 3.15 inch hole in watertight bulkhead No. 124 and a nearby unsealed pipe penetration in the same bulkhead. Pl.Exh. 31.

*Plaintiff's Claim of Gross Negligence*

In addition to its claims of ordinary negligence and breach of contract, plaintiff further alleged in its amended complaint:

22. ABS [defendant] was grossly negligent in performing its services, inspections, structural analyses, investigations, and recommendations during Vessel conversion design review and approval, conversion surveys, statutory certification and classification of the Vessel.

23. ABS was grossly negligent in the appointment, training, supervision, and review of the surveyors who performed the above described functions and in the review of the surveys performed.

24. Because of ABS's gross negligence, negligence and breach of its contractual obligations and [plaintiff's] reliance on ABS's representations, [plaintiff was] unaware of the Ves-

sel's condition which caused her sinking. [Plaintiff] put the Vessel into service in reliance on the certification issued by ABS.

26. ABS knew or should have known that at least one of the Vessel's subdivision watertight bulkheads was not watertight at the time they surveyed the Vessel. ABS also knew that they appointed an unfit surveyor to perform the Vessel's on board inspections. Notwithstanding these facts, ABS acted recklessly and with willful and wanton disregard for the lives of the Vessel's passengers and crew and [for] the rights of [plaintiff] and others when they issued the Vessel Load Line, SOLAS and classification certificates so as to justify the assessment of punitive damages in the amount of $200,000,000.

Plaintiff's gross negligence claim is based on defendant's failure to discover the holes in bulkhead 124 and the defective piping systems. Roy Curtis, plaintiff's marine salvage professional who made three investigatory visits to the vessel beginning in October 1988, was the first person to discover the holes and that the piping systems violated SOLAS requirements. *See* Pl.Rearg.Exh. 2 (Curtis Report). His report was thus the first information that plaintiff or the succeeding owner of the ship had of either defect. From 1976, when the defective Gray Water Piping System was installed, until Curtis's discoveries in 1988, a number of classification societies and government agencies inspected the vessel. These include the classification societies known as Det Norske Veritas and Lloyd's Register, both of which issued classification and safety certificates for the ship (for which they presumably performed full class and SOLAS surveys as well as annual inspections); the Swedish government; and the Canadian Coast Guard, which made an investigation to determine the cause of the sinking.

Although plaintiff's management had never heard of the holes, which Curtis concluded on the basis of his inspections had been cut into the bulkhead during the con-

version at the Oskarsham yard (Pl.Rearg. App.Exh. 2 at 14–15), one Sonny Sorquist, a pipefitter for the contractor, testified that he had spotted them during the 1984 conversion. He apparently told no one of their existence. Sorquist Tr. at 58–59, 64. Dan Ingemar Gustaf Eriksson, another pipefitter on the 1984 conversion job, testified that he had cleaned some debris away from the area in which a "cutting torch" was to be used to cut holes into the same bulkhead during the conversion. Eriksson Dep. at 35–37.

Against this background plaintiff has presented a number of expert witnesses to support its claims of gross negligence. One of the most frequently relied upon is William A. Cleary, to whom we have already referred. He is an adjunct professor of naval architecture at the Florida Institute of Technology with over 37 years experience in the field of international maritime safety, including 30 years with the United States Coast Guard, from which he retired as Chief, Naval Architecture Branch, Marine Technical and Hazardous Materials Division, Office of Marine Safety and Environmental Protection. *See* Pl. Rearg.App.Exh. 55. His 55–page report commented on standards that should be employed in the issuance of SOLAS and Load Lines certificates, and on the actual performance of a number of defendant's employees. Pl.Rearg.App.Exh. 3.

Cleary asserted in his report that defendant had " 'no set procedure' with regard to plan review and routing" and that "it is inconceivable that [defendant] could perform certification without a 'worklist' " to assure the receipt of all plans relating to the vessel. *Id.* at 19, 21–22. He stated that defendant should have been weeks earlier in requesting and reviewing plans (*Id.* at appendix 2), and that the plan reviews should have found that the Starboard Galley Drain violated SOLAS requirements. *Id.* at 39. Cleary also claimed in his report that (Pl.Rearg.App.Exh. 3 at 15):

Nilsson specifically testified that he had done all watertight bulkhead inspections on June 14, 1984. Nilsson p. 401.

He then went on to say:

It is impossible, in my opinion, for any single inspector to completely inspect all

SOLAS aspects of watertight integrity on any passenger ship in one day.

In the portion of his deposition to which Cleary's report referred, Nilsson had actually testified (Nilsson pp. 399–401):

Q. Do you have any idea when you examined those subdivisions?

A. This was work on a continuous basis. It was not possible to examine a bulkhead and then say that I want to look at it again. I saw these bulkheads every time I was passing by to more or less extent. But every time—which I did many times every day was walk in and around the vessel. I had bulkheads and everything else under observation.

. . . .

Q. [W]hat was the last date that you looked at subdivision bulkhead 124?

A. Well, it was a very late date because I went through and look through everything in Vancouver before I left the vessel.

Finally, the Cleary report asserted that surveyor Nilsson should have investigated the new Starboard Galley Drain Line, which ran within 20% of the hull where it would be presumed to be damaged in a casualty, because it was included in the conversion specifications. Pl.Rearg.Aff. ¶ 59, Pl.Rearg.App.Exh. 3 at 39–43.

One Luigi C. Sciandra also provided an expert report for plaintiff. He has a Ph.D. in Mechanical engineering and is in the process of earning a second doctorate in ocean engineering. He was employed by defendant for 14 years, for two of which he was a senior surveyor and three as a principal engineer. He is expert in the area of boilers, pressure vessels, and submersibles, and has been an engineering consultant since 1988. See Pl.Rearg.App.Exh. 36.

His report asserted that defendant should have assigned at least two surveyors to the Sundancer project, one having experience in structure and the other in machinery. Additionally, the Principal Surveyor in Sweden should have noted the need for rapid review and turnaround of drawings. Pl.Rearg.App.Exh. 10 at 12–14. A project manager should have been assigned to oversee the project, something

that several other organizations were doing at that time, and the surveyor should have hung a Ship General Arrangement Plan on the wall of his office in order better to follow the progress of the survey. Id. at 19, 26. And, among other problems, Sciandra also noted the existence as of June 11 of SOLAS deficiencies and the erroneous approval by defendant's employees of an alternator and the non-approval of a prime mover. Id. at 38–39, 52.

John Ian McCallum was another expert witness for plaintiff. He had been a surveyor for 16 years and Chief Surveyor for 11 years at Lloyd's Register, a competing classification society. He had also been Chief Naval Architect for 10 years at John Brown & Co., Ltd., where he was chief designer of the Queen Elizabeth II, and has been a naval consultant since 1981. See Pl.Rearg.App.Exh. 42. McCallum testified that plans are essential to a survey (McCallum. Tr. at 51, 52).

Q. . . . Would Lloyds ordinarily require a copy of the conversion specifications to be provided?

A. No, not particularly. They're much, much more interested in the plans which are attached to the conversion. They would like to see that. That's what they really have an interest in.

. . . .

Q. If Lloyd's were not provided copies of conversion specifications, how would they know what work was being done in the conversion?

A. They would get a copy of all the plans. That they would demand.

Q. What if there were particular work being done and no plans prepared for that work, how would Lloyd's know then that a particular kind of work was going on?

A. They would require to have plans. That is absolutely essential.

McCallum further testified that Lloyd's Register utilized a means by which it could insure that a shipowner had submitted all plans required in order to perform a survey: "By all means, yes. Oh, yes . . . there would be a checklist." Id. at 53. Upon

further questioning, he clarified that the document specifying which plans Lloyd's would require for a survey leading to issuance of a classification certificate was Lloyd's Rules, and that the shipowner would be "referred to the parts of the rules and regulations which enumerated the plans which had to be submitted." *Id.* at 54. With respect to surveys prior to issuance of safety certificates, he testified that no particular Lloyd's document enumerated required plans, but that a shipowner would be referred to the SOLAS convention itself. *Id.* at 55–56.

Additionally, plaintiff cites a report by one Fred W. Beltz. In November, 1984, some five to six months after the sinking of the Sundancer and more than two years before this action was filed, defendant's management commissioned Beltz, an engineer who had recently retired from a company known as DeLaval Turbines and a respected member of defendant's Technical Engineering Committee, to examine the procedures of the Machinery Technical Department with respect to its ability to review and approve plans and answer inquiries in an "appropriate, speedy manner."

Beltz was directed to identify problems and to make recommendations to rectify them. Hannan Dep. at 428–434. Beltz's ultimate report made no reference to the Sundancer casualty, but isolated several troublesome areas and described them in a fashion (sometimes with double punctuation marks!!) calculated to induce action on his suggested solutions. He concluded that "[t]he problems and in turn my recommendations are all ones of management and internal practices rather than technical expertise." Pl.Rearg.Aff.Exh. 31 at 1.

Among the problems Beltz considered were the Department's plan review and approval procedures and its quality control, as to which he came to a number of conclusions. Plaintiff's expert Sciandra in his report found the following to be the most significant of Beltz's conclusions (Pl.Rearg. App.Exh. 10 at 49–50, Exh. 31 at 2, 4–5):

(1) There is no preplanning in Machinery Technical, nor Hull Technical for that matter, the departments wait for plans and/or calculations to arrive!! There are no up front discussions with the client to develop what submittals are required, the timing or the desired sequence.

(2) There is no scheduling—lacking expediting by the client its first in first out—whenever!!

(3) After being logged in weeks may go by while a drawing moves to the top of the pile for review.

(4) Review of the work is haphazard—if a drawing or plan is approved without comment, the Principal may not see the submittal and frequently it may not be reviewed by a Senior.

. . . .

Within the ... Department, the basic review process appears to be sound except that the procedures and practices are not well defined and vary from Principal to Principal and from area to area. The net result is that things can and must fall between the cracks without traceability. The most obvious example is that a typical Plan Approval ... may not have been reviewed by the Principal.... Depending on the department it may or may not have been looked at by the Senior.

Beltz concluded that the process needed to become "PROACTIVE rather than REACTIVE." His recommendations included developing in advance a full submittal and approval schedule that is continuously revised, assigning a permanent identification number to a vessel when a contract to survey it is signed, estimating the time necessary for reviews in advance to ease staff scheduling, consider a "contract coordinator" to oversee an entire survey, making the entire process more visible, and establishing standard procedures for plan reviews. *See id.* at 3, 5.

Finally, plaintiff offered the expert report of C.R. Cushing & Co., Inc. on the question, which for present purposes we assume would be answered in the affirmative, of whether or not the alleged defects could have caused the Sundancer's sinking. *See* Pl.Rearg.App.Exh. 1.

Plaintiff proffered a variety of additional documents, deposition excerpts, and expert

opinions regarding acts of defendant that it alleged were grossly negligent. In support of an allegation that defendant overworked its employees, plaintiff points to a resignation letter discussing dissatisfaction with the writer's salary as the cause of his resignation, and a memorandum concerning defendant's exit interview with such writer which indicated that, though interested in returning to defendant if circumstances changed, he was unhappy with his salary, and that "no one in higher management ever spoke to him about his career path, and ... his responsibilities have dwindled and there are times when he has very little work to do." Pl.Aff.Exh. 29. Additionally, plaintiff presented a series of telegrams that culminated in defendant's buying back 20 days of surveyor Nilsson's vacation time. Pl.Rearg.Mem. at 13; Pl.Aff.Exh. 28. Nilsson testified that, after having "sold back" the time in question, he still received the full vacation time required by Swedish law. Nilsson Tr. at 311–12.

Plaintiff also suggests that defendant engaged in a "cover-up" to hide evidence of its grossly negligent acts. In that regard it points to Nilsson's destruction of his survey notes and the alleged tampering with the Log book kept in defendant's office in Sweden. With respect to Nilsson's notes, it appears from his uncontroverted testimony that it was his custom to discard and destroy handwritten notes made in the course of a survey after he had reduced them to a narrative script to be typed by a secretary and submitted as a report; and that he destroyed the last of his Sundancer notes after having learned of its sinking. Nilsson Tr. at 130–33. He testified: "I couldn't take any parallel results that my reporting and the grounding would have any connection with each other." Nilsson Tr. at 137. With respect to the alleged tampering with defendant's Gothenburg office Log Book, in which its surveyors record where and on what ship they are working, one David A. Crown, an expert on forgery, testified that the Log Book is filled with whited-out and changed entries

referring to a variety of ships. He observed that whited-out entries were commonplace in the log. "I believe my statement said with humor that they bought it [the white out] by the liter was not taken amiss. Yes, they used it frequently." Crown Tr. at 45. His testimony did not indicate that the whiting out of log entries relating to the Sundancer differed in any substantial way from those relating to other ships.[6]

Finally, plaintiff suggests that a "cover-up" may be inferred from Nilsson's action backdating the Classification certificate after it was was discovered that he had failed to issue it in a timely fashion. It further suggests that such an inference should be drawn from defendant's alleged efforts to conceal the Beltz Report.

\* \* \* \* \* \*

The extremely thorough discovery in this case has taken over five years and has resulted in the taking of more than 100 depositions and in the production of over 100,000 documents. For the most part it proceeded without trouble, although in 1990 the parties asked us to refer to a Magistrate Judge discovery disputes regarding material for which there was a claim of privilege. We did so, and Magistrate Judge Sharon E. Grubin disposed of those problems as they arose. The parties have agreed that discovery is now closed, and a pre-trial order has been submitted.

## DISCUSSION

The origin of the motion now before us is somewhat complex. The first indication of defendant's intention to submit a motion was contained in a letter to us dated April 11, 1991, which requested a conference to discuss a partial motion for summary judgment striking plaintiff's claims sounding in tort (negligence, gross negligence, and punitive damages) on the basis of *East River S.S. Corp. v. Transamerica DeLaval, Inc.* (1986) 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865. If this motion were success-

---

**6.** Crown did note that blocks of lines were reserved to record work on some ships and not for the Sundancer. However, it is clear from an examination of the pages plaintiff has excerpted from that log that such reservation was not a uniform practice. *See* Pl.Rearg.App.Exh. 35.

ful, only claims sounding in contract would remain. No mention of any claim for immunity based on Bahamian law was then suggested. On October 18, 1991 defendant filed the motion now before us raising the following contentions: plaintiff has contractually indemnified defendant with respect to all claims in question; plaintiff has not adduced evidence sufficient to support its claims for gross negligence; *East River* bars plaintiff's tort claims; Bahamian law is here controlling, and under that law defendant enjoys immunity with respect to the safety certificates it issued under Bahamian authority; plaintiff does not have a claim in contract for breach of the implied warranty of workmanlike performance under *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp.* (1956) 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; plaintiff has no claim for the tort of negligent misrepresentation.

At a conference held shortly after the motion had been filed, plaintiff's counsel complained that it was overbroad and so fact-intensive that it would be impossible to answer and wasteful of time. We tended to agree with this assessment, and suggested that plaintiff confine its opposition to the choice of law question and the related question of immunity under Bahamian law. We indicated that if plaintiff so limited its response, we would confine our decision to those two questions. We hoped that if so limited the matter might be resolved before the then scheduled trial date.

Our suggestion, however, did not prove to be productive. Plaintiff's opposition (consisting of a hundred and eleven page memorandum of law, hundred and four paragraph affidavit supported by sixty-nine exhibits in two volumes, and excerpts from thirty-four depositions) dealt in detail with every contention presented by defendant's motion.

In preparation for and during the course of the April 3, 1992 oral hearing on the motion, it occurred to us that there was an underlying question not specifically raised by defendant that might dispose of the entire case: does an entity that issues a license enabling the licensee to engage in certain activities undertake to assure the licensee of its fitness to undertake such activities? In this regard we reasoned by analogy that a person applying for a driver's license does not thereby seek assurance of an ability to operate an automobile but merely permission to do so; and that a car owner procuring an inspection sticker from a licensed garage does not seek assurance that the automobile is safe, but merely permission to operate it on public highways.

We tentatively concluded that the matter could be thus resolved, and on April 21, 1992 delivered to the parties a Draft Opinion so holding.[7] We requested responses thereto. Having received and considered such briefs and supporting materials (styled by plaintiff as a motion for reargument and by defendant as its opposition to such motion) we now conclude for the reasons that will shortly follow in Part A of this opinion that summary judgment on that question is not appropriate.

We therefore turn, in Part B, to a consideration of the contentions originally presented by defendant's motion. As to them the record before us includes over 300 exhibits and excerpts from more than 65 depositions. We shall discuss the questions raised by these contentions under the following formulations: (1) did plaintiff release or indemnify defendant from these claims?; (2) has plaintiff after five years of extensive discovery developed any facts that would justify a finding that defendant was grossly negligent?; if not, (2)(a) has plaintiff alleged a claim for the tort of negligent misrepresentation?; or, (2)(b) does the *East River* doctrine limit plaintiff to contract remedies only?; if so, (3) can plaintiff make out a contract claim under the *Ryan* doctrine?; and (4) does the law of the Bahamas grant defendant immunity with respect to all aspects of the instant complaint?

---

7. The Draft Opinion has been made part of the record as Exhibit 1 to Plaintiff's Reargument

Affidavit.

### A. *Our Draft Opinion*

In our Draft Opinion we proposed that the issuance by a classification society of certificates necessary for the operation of its customer's (plaintiff's) ship was not an assurance to the customer-shipowner that it had satisfied its non-delegable duty to provide a seaworthy vessel. On the contrary, it seemed to us, the shipowner looked only for documents that permitted operation of its vessel without running afoul of relevant regulations. While we did not consider what remedies against one who improperly issues such a certificate might be available to the victim of an accident that might have been prevented by the withholding thereof,[8] it seemed to us clear that the issuer of the certificate could have no liability to the owner who requested and utilized it.[9]

We also concluded that the disparity between the $85,000 contract price paid and the more than $64 million in damages claimed supported our conclusion that in issuing the certificates defendant had no intention of guaranteeing the vessel's seaworthiness or becoming the shipowner's insurer. As the Second Circuit observed: such an "enormous disparity between the fee ... charged ... and the damage liability ... allegedly assumed is persuasive evidence that assumption of that risk" is not within the contract. *Vitol Trading S.A., Inc. v. SGS Control Serv.* (2d Cir.1989) 874 F.2d 76, 81–82; *see also International Ore & Fertilizer v. SGS Control Services* (S.D.N.Y.1990) 743 F.Supp. 250, 257. Based on defendant's uncontradicted description of the nominated societies are the world's "most eminent" (Hearing Tr. at 24) and on plaintiff's assertion that the "modern climate of ... competition for statutory certification societies" is "fierce" (Pl.Opp. Mem. at 42), we inferred that the fees defendant charged here are comparable to those that any other of the classification societies nominated by the Bahamas to issue statutory safety certificates on its behalf would have charged. It thus appeared to us that accepted classification society practice with respect to fees indicates that such societies do not assume the risk of acting as insurer. In this respect, we believed Judge Tyler's dictum in *Great American Insurance Co. v. Bureau Veritas* (S.D.N.Y.1972) 338 F.Supp. 999, 1012 to be illuminating:

> In theory, recognition of a right of action against a classification society would confer benefit upon ship owners, ship operators and seamen. In practice, such a "new remedy" would produce several undesirable effects.... this right of action would have the effect of making the classification society an absolute insurer of any vessel it surveys and certifies.... this liability ... is also not in accord with the intent of the parties, the fees charged or the services performed.

Our confidence in the foregoing observations was enhanced by our analysis of all cases cited by plaintiff in its Supplemental Memorandum (or discovered by our own research), which demonstrated that—although classification societies have been in existence for generations—no case has been found in which such a society has been held liable to a shipowner for errors—negligent or otherwise—committed in the course of preparing and issuing a certificate that, in effect, licensed the shipowner to engage in certain activities.[10] Plaintiff offered no meaningful challenge to that conclusion.

---

**8.** *Cf. Psarianos, et al. v. Standard Machine, Ltd., Inc., Standard Marine (HELLAS) Ltd. and American Bureau of Shipping* (E.D.Tex.1989) 728 F.Supp. 438, 443 (defendant now before us liable in negligence to injured crew member); *see also infra* p. 377.

**9.** Plaintiff itself seems to recognize that shipowners are not the intended beneficiaries of any warranty of seaworthiness that might arise from statutory safety (SOLAS and Load Line) certificates: "SOLAS and Load Lines serve as the *passengers'* only real assurance that economic factors have not intolerably reduced a vessel's margin for safety" (Pl.Opp.Mem. at 41, emphasis added); and "It must be recognized that the *passenger's* need for 'special protection' is unusually compelling in the case of a cruise ship.... Violations of the safety requirements of the SOLAS and Load Lines Conventions endanger lives." (Pl.Opp.Mem. at 49–50, emphasis in original).

**10.** *See* Draft Opinion at 8–12.

We called attention to *Somarelf v. American Bureau of Shipping* (D.N.J. 1989) 704 F.Supp. 59, in which a motion for summary judgment made by the very defendant now before us had been denied. We noted that if the shipowner in that case should ultimately prevail it would not affect our analysis because it had not retained defendant to issue a certificate that would permit the doing of anything. On the contrary, it had retained defendant to calculate the tonnage of two certain vessels so that fees payable for passage through the Suez Canal could correctly be estimated. Plaintiff challenges this characterization, saying that we had neglected to mention that "those tonnage calculations were required in connection with [defendant's] issuance of a certificate under the International Convention on Tonnage" (Pl.Rearg. Mem. at 23–24). Plaintiff does not suggest why that fact would have been relevant. Suffice it to say that the *Somarelf* opinion makes no mention of any Convention. The court there denied defendant's motion for summary judgment because it found merit in plaintiff's contention that, defendant having negligently provided information necessary for the proper calculation of Suez Canal fees, plaintiff "had stated a viable claim for indemnity from ABS" on a theory of negligent misrepresentation based on 'Section 552 of the Restatement (Second) of Torts, Information Negligently Supplied for the Guidance of Others.'" 704 F.Supp. at 63–65. In the case now before us, plaintiff had not asked for "guidance" of any sort but simply for certificates that would entitle it to procure insurance and operate its vessel.

In short, plaintiff has presented no argument or authority that undercuts the logic of our Draft Opinion.

Plaintiff does, however, call our attention to one fact that gives us pause. In a wholly unrelated litigation (*Psarianos, et al. v. Standard Machine, Ltd., Inc., Standard Marine (HELLAS) Ltd. and American Bureau of Shipping* (E.D.Tex.) Docket No. B–84–298–CA) the defendant now before us made the following statement in a memorandum of law submitted to the court: "The second duty [of a classification society] is to use due care in the detection of defects in the ship that it surveys and *notification of such detected defects to the owner.*" Pl.Rearg.Aff.Exh. 3 at 31 (emphasis added). Although the litigation there in question was not brought by a shipowner but by and on behalf of injured and deceased seamen (*See Psarianos*, 728 F.Supp. 438, 440), defendant's statement of its duty to notify a *shipowner* of detected defects is quite explicit. Moreover, similar inferences might be drawn from various public statements made by defendant on its own behalf. *See* Pl.Rearg.Reply Aff. ¶¶ 3–5. While we tend to discount the significance of these statements, we recognize that an appellate court might well conclude that they constitute admissions requiring explanation before a finder of fact.

Accordingly, although we adhere to the conclusions stated in our Draft Opinion, we do not rely upon them. Instead, we turn to the other questions presented by defendant's motion and plaintiff's opposition thereto.

### B. *Further Questions Presented by the Motion*

#### (1) Contractual Indemnity and Release Clauses

 Defendant contends that the contract contains two release clause that, if given the interpretation and effect that defendant posits, would end this litigation right here. First it suggests that Term and Condition 14 of the Agreement—the "Hold Harmless" clause—is also a release by plaintiff of "any and all claims ... which may be brought against defendant," including those by plaintiff itself. As to that contention, we repeat our observation at the April 3 oral argument that a hold harmless clause and a release are two entirely different animals. The clause now before us is devoid of language in any way signaling plaintiff's intention to release defendant as well as holding it harmless from actions by third parties. Although defendant cites a Seventh Circuit case to the contrary (*Edward E. Gillen v. U.S.* (7th Cir.1987) 825 F.2d 1155), the rule in this Circuit is that "indemnity agreements are

generally designed only to protect against liability for damage to third parties." *Atlantic Richfield Co. v. Interstate Oil Transp. Co.* (2d Cir.1986) 784 F.2d 106; *see also Schiavone Constr. Co. v. County of Nassau* (2d Cir.1983) 717 F.2d 747 (indemnity clause too ambiguous to apply as between the contracting parties; remanded for parole evidence on that issue).

■ An unambiguous release clause does, however, appear on the Application for Load Lines attached to the Agreement, which was signed on behalf of plaintiff on the same day and by the same person who signed the Agreement:

> It is understood and agreed that ... the Bureau ... is [not] under any circumstances whatever to be held responsible for any inaccuracy in any ... certificate issued by the Bureau or its Surveyors ... or for any errors of judgment, default or negligence of its Officers, Surveyors or Agents.

Plaintiff urges that, despite the clause's unambiguous wording, it applies only to the Load Lines certificate, and that the possible application of this broad phrasing to other certificates issued under the Agreement creates an ambiguity that must be construed against defendant. As a matter of construction, this is not a powerful argument: the Application is acknowledged to be part of the Agreement,[11] the clause conflicts with no other term within the Agreement, the clause satisfies the Agreement's "unless mutually agreed in writing" stricture against modification of the enumerated terms and conditions, and the clause is clear and unambiguous on its face. This release is also discernable in the Agreement via the **"LIMITATION"** clause in Term 13. That clause refers the contracting party to Terms 11 and 12, which restrict defendant's representations to those set forth in its Rules. Thus the contracting party would naturally turn to the defendant's *Rules for Building and Classing Steel Vessels,* and in particular the **"RESPONSIBILITY AND LIABILI-**

**TY"** clauses. There one would find in the language in Rule 1.25 an unambiguous disclaimer of all liability (except, presumably, for gross negligence) that almost exactly tracks the release in the Application.

Nevertheless, although the question is close, and though the presence of the release clause in the Application and the reiteration of that release in Terms 11–13 of the Agreement (via defendant's published Rules) might be construed by a finder of fact as strong indications of how the parties intended to allocate liability between themselves, we believe that the placement and relative isolation of the former clause and the torturous trail one must follow to discover the release in the latter ones raise a question of fact as to the actual intention of the parties. Moreover, we are inclined, without the benefit of trial testimony as to the parties' intention, to agree with Judge Tyler's dictum that such total absolution from liability "is overbroad and unenforceable as contrary to public policy." *Great American Insurance Co. v. Bureau Veritas* (S.D.N.Y.1972) 338 F.Supp. 999, 1010, n. 6. We thus deny summary judgment on this question.

(2) Plaintiff's Gross Negligence Claim

The validity of plaintiff's gross negligence claim would determine whether or not it is entitled to punitive damages, and would affect our treatment of its other tort claims. The Southern District has defined gross negligence as meaning that "defendant has not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness." *Hong Kong Export Credit Ins. v. Dun & Bradstreet* (S.D.N.Y.1975) 414 F.Supp. 153, 160. The Second Circuit has "drawn attention to the close affinity of the concepts, gross negligence and deliberate indifference," citing—in a footnote—the Massachusetts Supreme Judicial Court's definition of gross negligence as an "indifference to present legal duty and utter forgetfulness of legal obligations, so far as other persons may be affected" *Doe*

---

**11.** In addition, the last line of the Agreement's signature page states in underlined bold capitals **"IF OTHER CERTIFICATION REQUIRED, SEE REVERSE SIDE,"** on which the Load Lines certificate is clearly noted as among the other services requested.

v. *N.Y.C. Dept. of Social Services* (2d Cir. 1981) 649 F.2d 134, 143, n. 4, *quoting Burke v. Cook* (1923) 246 Mass. 518, 141 N.E. 585.

Defendant asserts that plaintiff has produced no evidence that would warrant submitting the question of gross negligence to a trier of fact. *See Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265. To overcome this assertion, plaintiff must do more than merely make a contrary assertion. Having the burden of persuasion at trial, it must point to specific evidence that would allow a trier of fact reasonably to find that the necessary elements of gross negligence had been established. *See Borthwick v. First Georgetown Securities, Inc.* (2d Cir. 1989) 892 F.2d 178, 181; *Quarles v. General Motors Corp.* (2d Cir.1985) 758 F.2d 839, 840; *Delaware & Hudson R.R. Co. v. Consolidated Rail Corp.* (2d Cir.1990) 902 F.2d 174, 177.

Reviewing the evidence plaintiff has submitted on this issue (*supra* pp. 370–374), it appears that it can be divided into two categories: (1) expert testimony tending to establish considerable disorganization in the procedures by which defendant attempted to carry out its Agreement with plaintiff; and (2) expert and other testimony designed to establish that one or more grossly negligent acts or omissions directly resulted in defendant's failure to discover the holes in bulkhead 124 or the violative piping systems that are claimed, and for present purposes assumed, to have caused the sinking. Plaintiff additionally urges that gross negligence can be inferred from defendant's alleged attempt to "cover-up" its delinquencies. We address these matters in turn.

■ It must be conceded that plaintiff has raised a question of fact concerning, indeed has pretty well established, a general disorganization in defendant's operations. However, absent evidence establishing that defendant was aware of—or en-

tirely indifferent to—its own infirmities and nonetheless undertook to perform work for which it was unqualified, mere disorganization would not only fail to establish gross negligence, but would fail to establish actionable negligence at all. Proof of disorganization—without more— could not of itself establish causation of any particular injury suffered by plaintiff.[12]

There being no scintilla of evidence of such awareness or utter indifference on defendant's part, we look to see whether gross negligence can be established with respect to any particular act or omission that could be said to have prevented discovery of the defects claimed to have caused the sinking. The evidence upon which plaintiff relies may be divided into two categories: the Beltz Report, which was created by defendant itself; and the reports and testimony of experts retained by plaintiff for the purpose of proving its case. The Beltz Report has no relevance to our inquiry concerning the effect of any particular act. It in no way mentions the Sundancer, confines itself exclusively to procedures, and does not identify a single negligent act or omission attributable to any employee of defendant. Accordingly, we shall not again refer to that Report in this connection, but confine ourself to the reports and testimony of plaintiff's retained experts.

We turn first to the asserted cause of defendant's failure to detect the inadequacies in the ship's piping systems. Plaintiff's expert testimony is replete with adjectives and adverbs and with statements that defendant "should have" done this or that or "should have" looked here or there. However, upon a careful reading, it becomes clear that such testimony is nothing more nor less than an attempt—with 20-20 hindsight—to figure out how to blame defendant for the tragedy that occurred. There is no suggestion—let alone proof—

12. On the other hand, it seems to us that if it had been established that defendant had undertaken to issue certificates knowing of—or utterly indifferent to—its lack of qualification to perform the necessary work, the law might obviate the necessity of proving causation by establishing a presumption that such lack had been the cause of any imperfection that might be found in the work defendant had improperly undertaken.

that any act or omission on the part of any of defendant's employees could be described as a departure from accepted industry practices or otherwise as "so extremely careless that it was equivalent to recklessness."

Perhaps the closest thing to an exception to the foregoing is plaintiff's assertion that defendant had an obligation to keep a "checklist"; and that the existence and use of such a list would have enabled defendant to verify whether plaintiff—as it assured defendant it had done—had indeed supplied all the plans defendant had requested of it.[13] For present purposes we must assume that utilizing such a checklist would have been a good idea and would indeed have permitted defendant to become aware of plaintiff's dereliction. However, here again, there is not a suggestion in the evidence that failure to create and maintain such a checklist was in any way at variance with established industry practice. In this respect, expert Cleary stated that it would be "inconceivable" not to use a "worklist," while expert McCallum merely indicated that it was the practice at Lloyd's Register to use some form of checklist. However, aside from that statement about Lloyd's,[14] there is nothing in the record to suggest that any other of the classification societies designated by the Bahamas, had adopted such a practice. See supra at pp. 371, 373. Nor, of course, is there anything in the record about the practices of the many other societies with which defendant competes.

Turning to surveyor Nilsson's failure during his inspections to discover the holes or violative piping systems, plaintiff advances several theories:

1) He was grossly negligent in attempting to complete in a single day a full SOLAS inspection of every watertight bulkhead;

2) He was grossly overworked by defendant; and

3) His simple failure to find the defects in itself established gross negligence.

With respect to the first theory, as we have seen, supra p. 371, plaintiff's claim is based on an absurd misconception of the relevant evidence.

Regarding the second theory, plaintiff emphasizes two items of evidence. We should, plaintiff urges, draw an inference of overwork from defendant's having "bought back" 20 days of Nilsson's vacation time. However, it is uncontroverted that, the "buy back" notwithstanding, Nilsson had received at least the amount of vacation time the government of Sweden had determined to be sufficient. Plaintiff also asked us to infer that Nilsson was overworked by citing a resignation letter submitted by another of defendant's employees. However, as we have seen, supra p. 374, that employee's complaint was not that he had been overworked, but that he had been underpaid, underappreciated, and underworked.

This leaves plaintiff with the bare assertion that the holes were there and, ideally, should have been found. Assuming for present purposes that a finder of fact could draw an inference of negligence simply from defendant's failure to make a discovery, it can hardly be said to establish "indifference to present legal duty and utter forgetfulness of legal obligations." Not a single surveyor or investigator who inspected the vessel over a period of 12 years (1976–1988) with respect to the Grey Water Piping System, and four years (1984–1988) with respect to the holes and the Starboard Galley Drain succeeded in detecting the defects. These professionals include surveyors from at least two other classification societies (Det Norske Veritas and Lloyd's Register), who performed full class and SOLAS inspections or annual sur-

---

**13.** We find no merit in plaintiff's repeated suggestions that it could somehow avoid responsibility for providing defendant with requested information by delegating such responsibility to its conversion shipyard. See Pl.Rearg.Aff. ¶ 13, Pl.Rearg.Reply Mem. at 5, Pl.Sur.Aff. ¶ 8.

**14.** Of course Lloyd's, with its checklist, also failed to discover the violative piping systems when it issued certificates to the refitted vessel after the casualty.

veys;[15] officials of the Swedish government; and Canadian Coast Guard investigators who examined the Sundancer for the express purpose of determining the cause of its sinking.

The "cover-up" theory must also fail. With respect to Nilsson's "destruction" of his the last of his handwritten survey notes after having learned of the sinking, his uncontradicted testimony established that he did so pursuant to his regular practice. Moreover, plaintiff has produced absolutely no evidence that challenges Nilsson's wholly reasonable testimony that upon hearing that the Sundancer's captain had run the ship aground, ripping a hole into its hull, it did not dawn on him that he would someday be blamed for the disaster. *See supra* p. 374.

Concerning the presence of whited-out entries in defendant's Gothenburg Log Book, it is undisputed that this practice—as sloppy as it may be—was routine in that office. Moreover, as we have observed *supra* p. 374, plaintiff is unable to point to anything that suggests that this endemic practice was in any way associated with the Sundancer.

Regarding the alleged "suppression" of the Beltz report (which plaintiff has characterized as a "smoking gun") there was a dispute between the parties as to whether or not plaintiff experienced undue difficulty in obtaining it. The resolution of this dispute would require a hearing, which we find not to be necessary. We cannot conceive that an otherwise conscientious litigant—as defendant has shown itself to be—would single out this particular, basically innocuous, document for suppression.

Finally, plaintiff points to the circumstance that Nilsson backdated the Classification certificate he issued on June 21 to reflect the issuance date—June 14—appearing on the other relevant certificates. Whether or not, as plaintiff contends, this act was both gross negligence and *ultra vires*, it occurred one week before the casualty, when only the most prescient person would have realized that there was anything to cover up.

The copious exhibits and depositions the parties have submitted in support of and opposition to this motion are the weighty fruits of nearly five years of painfully thorough discovery. Having carefully considered the evidence that plaintiff asserts supports its claim of gross negligence, we conclude that it does not raise a question of fact as to such a claim, and that no reasonable finder of fact could find that it does.

### (2)(a) Negligent Misrepresentation

Plaintiff also alleges a claim for negligent misrepresentation. The Restatement (Second) of Torts § 552, which specifies this tort as "Information Negligently Supplied for the Guidance of Others," reads in part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Comment (a) to § 552(1) observes that "a narrower scope of liability is fixed for neg-

---

15. Although plaintiff vociferously argues that "annual inspections are different, in both scope and thoroughness, from the complete initial SOLAS survey ABS [defendant] was required to perform on the Vessel" (Pl.Rearg.Reply Mem. at 16), we note that its own expert witness, William Cleary, testified with respect to an annual survey that he would conduct it as if it were an initial one because (Cleary Tr. at 32):

> if I am the surveyor and I am going to sign that certificate that says William Cleary on behalf of the Bahamas Government have reviewed this ship and ... that I've looked at the machinery [and] I have looked at the watertight subdivision and ... Each year annually I put my name on there and it's a seal ... that says I certified that it is complete and efficient. Efficient to me means correctly done.

Moreover, several of the inspections—including a complete initial SOLAS survey—had been performed after the Sundancer had been raised from the bottom of the sea. One would think that such a circumstance would make any surveyor more, rather than less, alert.

ligent misrepresentation" than for other types of negligent supplying of goods or information. A person undertaking to supply information is subject to a relative standard of care defined by a balancing of the known use of the information and the potential loss if the information is flawed. And a person seeking information "may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose."

■ Accordingly, to prevail on a claim for this tort a plaintiff must establish that the defendant: (1) at plaintiff's request supplied information for it's guidance; (2) failed to use reasonable care in so doing; (3) knew plaintiff would rely on the information for particular purposes; and (4) plaintiff suffered an economic loss because it relied on the information. *See Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.* (5th Cir.1987) 826 F.2d 424, 428–29.

■ For present purposes we shall assume that elements (2), (3), and (4) have been established. There is not, however, a scintilla of evidence with respect to the first of the required allegations, that plaintiff had asked defendant to provide it with any information for its guidance.

The facts before us present a sharp contrast to those in *International Ore & Fertilizer v. SGS Control Services* (S.D.N.Y. 1990) 743 F.Supp. 250, upon which plaintiff relies. In that case, rather than having asked the defendant for a certificate (or license) that would have permitted the operation of a ship or the obtaining of insurance, the shipowner had asked the defendant to make an examination of its ship's holds for the specific purpose of determining whether or not they were sufficiently clean safely to receive a specified delicate cargo. The defendant made a sloppy inspection and, knowing that its inspection was incomplete, nonetheless issued a certificate of cleanliness. Plaintiff, acting on that certificate, loaded the cargo into the hold. The cargo was ruined. Not surprisingly, plaintiff was allowed to recover on its claim of negligent misrepresentation.

The facts in the only other relevant cases that have come to our attention, *Dillingham Tug & Barge v. Collier Carbon* (N.D.Ca.1981) 548 F.Supp. 691 and *Somarelf v. American Bureau of Shipping* (D.N.J.1989) 704 F.Supp. 59, are unlike those before us. In *Dillingham,* a shipowner sought from the defendant assurance that its barge was seaworthy for a specific extraordinary voyage under specific extraordinary conditions. Having received such assurance, the shipowner undertook the voyage. The barge sank. Defendant had been aware of the shipowner's reliance, and knew or should have known that its assurance was either unwarranted or made without the exercise of reasonable care.

In *Somarelf*—as more fully explained *supra* p. 377—a shipowner had requested the defendant (who happened to be the defendant now before us) to calculate the tonnage of two of its vessels so that the appropriate fees payable for passage through the Suez Canal could be determined. Plaintiff alleged that defendant had negligently made an erroneous calculation, and that it had thereby been damaged. The court, finding that a question of fact had been presented by these allegations, declined to dismiss them.

None of these authorities—or any other we have been able to find—suggests that the record before us could support a claim for the tort of negligent misrepresentation. We accordingly dismiss that claim.

### (2)(b) The "East River" Bar Of Tort Claims

Defendant contends that the doctrine set forth in *East River S.S. Corp. v. Transamerica DeLaval, Inc.* (1986) 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865, bars all of plaintiff's claims that sound in tort. The Court there held that "a manufacturer in a commercial relationship has no duty under either a negligence or a strict products-liability theory to prevent a product from injuring itself" because "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies ... because the parties may set the terms of their own agreements" or procure insur-

ance or otherwise allocate liability by contract. 476 U.S. at 871–875, 106 S.Ct. at 2302–04. In such a commercial contract context, "public policy concerns which underpin the imposition of a duty in tort—the need to provide consumers with greater protection form personal injury and property damage than is afforded by warranty or contract—are not implicated." [16] *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.* (5th Cir.1989), 866 F.2d 752, 753.

The Fifth Circuit in *Employers Ins.* applied this doctrine to professional services, as contrasted to the "product" (a turbine engine) dealt with in *East River*, 866 F.2d at 766. And in *Shipping Corp. of India v. ABS* (S.D.N.Y.1990) 744 F.Supp. 447, Judge Motley applied *East River* to relieve the defendant now before us from tort liability for its professional services in issuing classification certificates.

■ Essential to the *East River* doctrine is a finding that there are no "large disparities in bargaining power" between the parties before the court. 476 U.S. at 873, 106 S.Ct. at 2303. This element is abundantly established in the instant case. Plaintiff is owned by three large, sophisticated companies with substantial assets, and can be expected to have bargained from that position. It had selected defendant from among many competing classification societies. Being at that time free to select the flag of any nation in the world under which to operate its ship, plaintiff was not limited to the six classification societies nominated by the Bahamas. However, assuming that plaintiff had some compelling reason for selecting the flag of the Bahamas, it still could have, had it considered the contract offered by defendant to have been in anyway objectionable, selected any of the five competing societies nominated by that country, including Lloyds Register of shipping, by which society the ship had previ-

ously been classed. It follows that the Agreement into which plaintiff ultimately entered could not be found to be the result of anything but arms-length bargaining.

The second essential element of the *East River* doctrine is that the claims deal with losses that are purely economic. With respect to the plaintiff's major claims, such as the loss of the ship, lost profits, etc., this is a classic *East River* case in which "[t]he tort concern with safety is reduced [because] the injury is only to the product itself" (476 U.S. at 871, 106 S.Ct. at 2302). However, as we have seen *supra* page 370, there were a number of injuries, some requiring hospitalization, that were clearly attributable to the ship's extreme list. The severity of the list, plaintiff reasonably contends, resulted from defendant's negligence, which negligence we assume to have been established for our present purposes. It follows we cannot say as a matter of law that the *East River* doctrine bars any tort claims which those injuries may have occasioned.

In this connection we reject defendant's contention that the passenger injury damages are for indemnification and thus "purely economic." The two cases proffered in support of this assertion address litigations in which plaintiffs' damage claims were in no way related to any personal injuries. In *Orion Ins. Co., P.L.C. v. United Technologies Corp.* (E.D.Pa.1989) 1989 A.M.C. 2664, 2668, 1989 WL 70693, the plaintiff sought damages in negligence and strict products liability for the cost of a helicopter destroyed in a crash in which its occupants were killed, and asserted no claims for or relating to the deceased persons. The court dismissed the complaint on the basis of *East River*, reasoning that since plaintiff sought only damages related to the helicopter itself, "the tragic loss of life occasioned by the crash of the helicopter ... does not alter the fact that the plaintiff's claim is fundamentally an action

---

**16.** The Court left open "the issue of whether a tort cause of action can ever be stated in admiralty when the only damages are economic." *East River*, 476 U.S. 858, 871 n. 6, 106 S.Ct. 2295, 2302 n. 6. Because we have found that plaintiff has not established its claims for gross negligence (*supra* Part 2, p. 378) or negligent misrep-

resentation (*supra* Part 2(a), p. 381), we need not reach the issue of whether this caveat applies to either of those tort theories. *See, e.g., International Ore* (implicitly holding that tort of negligent misrepresentation can be asserted despite application of *East River* doctrine to other tort claims).

for economic damages only." Similarly, in *ERA Helicopters, Inc. v. Bell Helicopter Textron, Inc., et al.* (E.D.La.1987) 1987 WL 10868 the plaintiff sought to recover only the value of a helicopter damaged in an emergency landing, but made no claim for any damages arising from personal injuries received in the accident. The crucial factor in both of these cases was that the plaintiff did not, as the plaintiff before us has, assert a claim ultimately based on personal injury.[17]

We find the analysis in *Icelandic Coast Guard v. United Technologies Corp.* (D.Ct.1989) 722 F.Supp. 942, cited by plaintiff, to be more persuasive. In that decision Judge Cabranes assessed tort claims asserted in the aftermath of a helicopter crash off the coast of Iceland. Following *East River*, he granted summary judgment dismissing those of plaintiff's claims that related to commercial economic losses (replacement of the helicopter, training replacement crews) but let stand those claims arising out injuries to persons (the cost of searching for the lost crew members). We believe this approach—determining claims individually according to their derivation—to be correct.

We conclude, therefore, that those of plaintiff's tort claims that relate to the loss of the vessel, and the like, are purely economic losses barred by *East River* and grant summary judgment dismissing them. On the other hand, plaintiff's tort claims relating to losses it suffered as a result of being called upon to indemnify passenger injuries are not affected by the *East River* doctrine.

### (3) Plaintiff's Contract Claim Under the "Ryan" Doctrine

*Ryan Stevedoring Co., Inc. v. Pan–Atlantic Steamship Corp.* (1956) 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 was an action between a shipowner and a stevedoring company that had agreed to load and later unload the shipowner's vessel. A longshoreman had sued and recovered from the shipowner for personal injuries resulting from an unsafe condition created by the stevedore's improper method of loading. The shipowner then sued the stevedore for indemnification. In affirming the owner's judgment against the stevedore, the Court noted that, in undertaking to load and unload the ship, and in assuming control of that operation, the stevedore had given the shipowner an implied warranty of workmanlike performance, and that the longshoreman's injury was the direct result of its breach of that implied warranty. 350 U.S. at 133–34, 76 S.Ct. at 237.

The rationale of the *Ryan* case was aptly stated by the First Circuit in *Parks v. United States* (1st Cir.1986) 784 F.2d 20, 26:

> The rationale for allowing indemnity on the basis of this implied contractual undertaking arises from a combination of two factors: (a) the shipowner's nondelegable duty to provide a seaworthy vessel ... and (b) the fact that a stevedoring company *which takes control of the ship* to unload it is, during the course of that operation, more capable than the shipowner of avoiding accidents. (Emphasis added, citations omitted).

Simply put, *Ryan* (and its progeny) stand for the proposition that although a shipowner has a nondelegable duty of seaworthiness, under certain specific and limited circumstances it can share its absolute liability.[18] Thus, "a contractual right to in-

---

**17.** We leave for another day, should it become necessary, defendant's argument (to which plaintiff did not reply) that "since plaintiffs agreed to hold ABS harmless at least with respect to third party claims (except those arising out of the sole negligence of ABS), it would be ironic and unjust if plaintiffs could recover through a tort indemnity claim that which they assumed responsibility for by contract." Def. Rearg.Opp.Mem. at 13. *See also Purolator Prod-* *ucts Corp. v. Allied–Signal, Inc.* (W.D.N.Y.1991) 772 F.Supp. 124.

**18.** This nondelegable duty is, in general, so absolute that a shipowner in possession of a certificate issued by a classification society cannot "make a favorable survey or classification the basis of a due diligence defense" where a ship is found to be unseaworthy. *Great American Ins. Co. v. Bureau Veritas* (S.D.N.Y.1972) (Tyler, J.) 338 F.Supp. 999, 1012. *See also Federazione Italiana Dei Corsorzi Agrari v. Mandask Compa-*

demnification is implied if there are 'unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety,'" *Maritime Overseas Corp. v. Northeast Pet. Indus.* (1st Cir. 1983) 706 F.2d 349, 353 (*quoting Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority* (1st Cir.1982) 693 F.2d 1, 2. The "unique" factors that permit indemnification liability under an implied warranty of workmanlike performance pertain especially to "elements of expertise, control, supervision and ability to prevent accidents." *Fairmont Ship Corp. v. Chevron Int'l Oil Co., Inc.* (2d Cir.1975) 511 F.2d 1252, 1257. In that case the Second Circuit specified those elements at 1258:

> the crucial elements of *Ryan* [are] as follows: a shipowner, relying on the expertise of another party ... enters into a contract whereby the contractor agrees to perform services *without supervision or control by the shipowner;* the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault. (Emphasis added, citations omitted).

The "nature and extent of the implied warranty of workmanlike service and any resulting indemnity, depend[ ] upon the terms of the contract giving rise to the warranty." *Parks,* 784 F.2d at 27.

▇ Those elements do not here exist as between defendant and plaintiff. The Agreement between the parties, as we have concluded, required defendant to inspect the vessel and to provide certificates that would allow plaintiff to operate it. Nowhere in the Agreement does defendant undertake to make any structural changes to the vessel, or to guarantee that the naval architects, contractors, and shipyard selected by plaintiff would satisfactorily perform their respective assignments, or to assume liability if the vessel turned out to be unseaworthy.

Nor does there exist the necessary control of defendant over the work. The defects that plaintiff claims to have proximately caused the sinking of the Sundancer were created either by its own employees—the holes in bulkhead 124 and the Starboard Galley Drain—or by whomever may have owned the ship in 1976—the improper Grey Water Piping System. Defendant had no control over, and did not create, any of these problems. Rather, control over all aspects of the Sundancer conversion, and possession of all plans related thereto, were at all times in the hands of plaintiff or its designees. *See In re Amoco Cadiz* 1986 A.M.C.1945, 1950–53, 1986 WL 4705.

Finally, we also find instructive and persuasive Judge Tyler's dictum in *Great American* with respect to the kind of control a classification society can exercise over a shipowner:

> Presumably one of the reasons that the Supreme Court decided in *Ryan* to shift the responsibility for the unseaworthy condition to the stevedore was the fact that the owner had little or no direct, immediate control over the stevedore or its services there provided. Recognizing this rationale, I note that the services and activities of a classification society differ markedly from those provided by a stevedore, carpenters, ship's cleaner, and the like. While an owner may have little or no direct control of the activities of a classification society aboard ship, the society rarely, if ever, would create hazards or defects by its functions and activities. Moreover, unlike a stevedore and other similar service contractors, a classification society is functionally incapable of repairing or rectifying defects or hazards caused by itself or others. Virtually all a society can do is observe and report to the owner whatever its inspections reveal. In light of these distinc-

*nia de Vapores, S.A.* (2d Cir.1968) 388 F.2d 434 (shipowner cannot assert favorable survey or possession of certificate issued by classification society to show that it properly fulfilled non-delegable duty of seaworthiness); *In re Marine Suphur Transport Corp.* (S.D.N.Y.1970) 312 F.Supp. 1081.

tions, to rule that a ship owner or operator can evade or pass off his historic primary duty to furnish a seaworthy vessel by strict application of the *Ryan* doctrine to a classification society, in my judgment, would work an unsound and unfair dilution of that legal duty.

338 F.Supp. at 1015 (citations omitted). The force of these observations is particularly strong on the facts before us. We conclude, therefore, that plaintiff's claims in contract under the *Ryan* doctrine fail as a matter of law.

(4) Immunity Under Bahamian Law

■ Before turning to defendant's claim that it is the beneficiary of a qualified immunity under Bahamian law, we must deal with plaintiff's contention that the parties contracted that New York law should apply. In this connection plaintiff concedes, as it must, that the original Agreement between the parties contained no such provision, and that the Agreement did provide that it was to be governed by its own terms and conditions "unless otherwise mutually agreed in writing." Plaintiff argues, however, that the requirement of such a mutually agreed upon writing was accomplished, and the Agreement modified, by defendant's forwarding to plaintiff—and by Sjogren's having initialled and caused plaintiff to pay—certain invoices, the reverse side of which contained a provision selecting New York law.

We find this contention to be frivolous. If—as it seems to us necessary in the situation before us—the requirement of an "agree[ment] in writing" imports the necessity of some sort of signature, we observe that Sjogren's initials appear on approval stamps that plaintiff glued to the reverse of the invoices in such a way that they obliterate the critical law selection clause. *See supra* p. 367. Thus the choice of law clause had been physically eliminated from each document upon which Sjogren's initials were inscribed.

If—as plaintiff now contends (see Pl.Rearg.Reply Aff. ¶¶ 20–21)—Sjogren could have "agreed" to modify the contract without any written evidence of such agreement, but merely by permitting plaintiff to pay the invoices submitted by defendant, his testimony that he was unaware that the Terms and Conditions on the reverse side of those invoices were in any way different than those in the Agreement itself conclusively establishes that he had no intention so to modify the original Agreement.[19] It follows that nothing Sjogren did could have introduced a choice of law clause into the Agreement.

Having so concluded, we must engage in a federal maritime choice of law analysis to determine whether Bahamian law, as defendant suggests, or New York law, as plaintiff urges, should here control.[20]

---

**19.** Sjogren's specific testimony is as follows (Sjogren Tr. at 51):

> Q. In reference to the terms and conditions ... would you have reviewed those terms and conditions?
> A. *These terms and conditions are more or less the same terms and conditions for the contract with ABS.*
> Q. You would have reviewed them sometime prior to the—to your approving the invoices?
> A. Yes.

It is interesting to note that plaintiff's counsel in its subsequent examination of Sjogren went to great lengths to suggest the *possibility* of his having seen the choice of law clause that allegedly modified the Agreement, but never once referred to Sjogren's categorical assertion that he had been unaware that the invoice provisions were any different than those included in the original Agreement. As to the otherwise unidentified Johnson Lines Superintendent, who initialled invoices upon which the clause in question had not been obliterated, even if we

were to assume *arguendo* that it was his purpose and desire to revise the contract Sjogren had signed for plaintiff, there is nothing in the record to suggest that he had any authority to achieve such a result.

**20.** We need not engage in a New York choice of law analysis, as New York courts would apply federal maritime choice of law principles. See *Cruz v. American Export Lines, Inc.* (1986) 67 N.Y.2d 1, 9, 499 N.Y.S.2d 30, 33, 489 N.E.2d 1042, 1045, in which the Court of Appeals wrote with respect to claims under the Longshoremen's and Harbor Workers Compensation Act, 33 U.S.C. §§ 901–950, that "[i]n admiralty cases 'we proceed cautiously cognizant that it is the general maritime law that governs the rights and liabilities of the parties'.... Answers to the questions presented are 'obtainable solely by recourse to Federal law.'") (*citing Alvez v. American Export Lines, Inc.*, 46 N.Y.2d 634, 638, 415 N.Y.S.2d 979, 389 N.E.2d 461, *aff'd* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284).

Three Supreme Court cases set forth the standard for this analysis: *Lauritzen v. Larsen* (1957) 345 U.S. 571, 582, 73 S.Ct. 921, 928, 97 L.Ed. 1254; *Romero v. International Terminal Operating Co.* (1959) 358 U.S. 354, 382–83, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368; and *Hellenic Lines Ltd. v. Rhoditis* (1969) 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252. In *Lauritzen,* a Jones Act case dealing with an injured seaman in which the shipowner was the defendant, the Court lists seven factors to weigh in "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved": place of the wrongful act, law of the flag, allegiance or domicile of the injured party, allegiance of defendant shipowner, place of contract, inaccessibility of foreign forum, and law of the forum. 345 U.S. at 582, 73 S.Ct. at 928. In *Romero* the Court extended the *Lauritzen* analysis to maritime law generally, noting that there "[t]he controlling considerations are the interacting interests of the United States and of foreign countries." 358 U.S. at 382–83, 79 S.Ct. at 485. And in *Hellenic Lines,* the Court, adding the defendant shipowner's base of operations to the list, explained that the *Lauritzen* test is neither exhaustive nor mechanical, but "the significance of one or more factors must be considered in light of the national interest served" by the particular claim asserted. 398 U.S. at 308–09, 90 S.Ct. at 1734. That is, the factors are selected to clarify the connection, so far as it relates to the incident in dispute, between the parties and the legal authority they posit.

 Turning to factors other than the flag, it appears to us that they point indiscriminately to much of the globe, land and sea, between Sweden and Canada. The wrongful acts alleged to be chargeable to defendant are claimed to have taken place in Sweden, New York, London, Miami, Mexico, California, and on the high seas. Plaintiff, the injured party, is a Panamian corporation owned by Swedish, Finnish, and United States interests. The vessel was managed by a Swedish company, while its home berth at the time of the casualty was in Canada, and its base of operations

with respect to marketing and administration was in the State of Washington. The defendant is a New York corporation based in New York City with offices throughout the world. The bulk of defendant's contacts with plaintiff occurred in its offices in Sweden, London, and New York. The place of contract was Sweden, where it was signed and for the most part negotiated. Defendant received the contract in New York after it had been signed. No one contends that any foreign forum would be inaccessible. The law of our forum would be that of New York, though as noted *supra* note 20, New York courts would apply federal maritime law.

The law of the flag is, of course, Bahamian law. Although the flag is the only Bahamian contact, we believe this factor to be the most compelling because of the flag state's clear and powerful interest in the actions that are at the heart of this case, and because the other factors point to a variety of fora with lesser or no interest in those events. As the Court observed in *Lauritzen,* 345 U.S. at 584–85, 73 S.Ct. at 929:

[p]erhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag. Each state under international law may determine for itself the conditions on which it will grant its nationality to a ... ship, thereby accepting responsibility for it and acquiring authority over it.... the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction ... because 'it is deemed to be a part of the territory of that sovereignty [whose flag it flies].' ... the weight given to the ensign overbears most other connecting events in determining applicable law. (Citations omitted).

Plaintiff alleges that defendant was negligent in issuing statutory safety certificates in the name of the Bahamas, which it could do only under a specific grant of authority from that government. For example, plaintiff's expert Cleary observed that "ABS WAS, FOR THIS OPERATION,

THE GOVERNMENT OF THE BAHAMAS." Pl.Rearg.App.Exh. 3 at 7. Moreover, Regulation 6 of the International SOLAS Convention, which allows signatory governments to "entrust the inspection and survey" to such entities as defendant, provides that "[i]n every case the Government concerned fully guarantees the completeness and efficiency of the inspection and survey." Thus the Bahamas, under whose flag plaintiff elected to operate its vessel, has undertaken in issuing safety certificates to assure all its fellows signatories to the SOLAS convention that they will be reliable. The authority of no other state is comparably implicated in this suit, nor is the claimed violation of the laws of any other state similarly the gravamen of the complaint. All the possible fora recognize claims in tort and for breach of contract, but here the alleged misdeeds are directly tied to acts performed under the authority of the Bahamas.

Plaintiff's contentions to the contrary are unpersuasive. First, the cases plaintiff cites for its contention that the law of the flag is not an important factor all deal with torts alleged to have been committed by shipowner defendants, sailing under "flags of convenience," that seek to avoid some compelling public policy carefully designed by the state in which the alleged tort was committed.[21] In contrast, here it is the plaintiff that seeks to avoid the carefully constructed policies (designed particularly for the issues presented by this lawsuit) of the government under whose flag it chose to sail. Having weighed the various factors, we cannot see that the United States or any foreign forum has as great an interest in seeing its laws applied, and conclude that Bahamian law should govern.

■ Turning to the question of whether or not Bahamian law immunizes defendant, we are presented with affidavits from and testimony by two extraordinarily well qualified Bahamian attorneys: Sir Leonard Knowles for defendant and Michael R. Scott, Esq. for plaintiff.

Section 279 of the Bahamian Merchant Shipping Act ("Act"), chapter 246 of the Statute Law of the Bahamas, provides:

> Every officer appointed under this Act, and every person appointed or authorized under this Act for any purpose of this Act, shall have immunity from suit in respect of anything done by him in good faith or admitted to be done in good faith in the exercise or performance, or in the purported exercise or performance, of any power, authority or duty conferred or imposed on him under this Act.

Initially, we observe that both experts agreed that they could find no Bahamian case, reported or otherwise, dealing with the applicability of the quoted section to classification societies. Additionally, they agreed that neither bad faith nor *ultra vires* acts are within § 279's immunity.[22]

Sir Leonard gave it as his opinion that § 279 immunized defendant from all claims asserted in this litigation. He asserted two separate grounds for this opinion. First, defendant is a (corporate) "person" for the purposes of § 279 and thus within its protective ambit because § 3 of the Interpretation and General Clauses Act defines "person" as "includ[ing] any public body and any body of persons, corporate or unincorporate." And second, on the theory of

**21.** Plaintiff cites the following cases: *Sosa v. M/V LAGO IZABAL* (5th Cir.1984) 736 F.2d 1028 (seaman severely burned when engine exploded); *Jose v. M/V FIR GROVE* (D.Or.1991) 765 F.Supp. 1024 (claim by plaintiff sailors that shipowner fraudulently schemed to pay below contracted rate, and to blacklist when sailors sued); *EEOC v. Bermuda Star Line, Inc.* (M.D.Fla.1990) 744 F.Supp. 1109 (Title VII employment discrimination on the basis of gender). See Pl.Opp.Mem. at 85–86. Plaintiff also cites *Rainbow Line, Inc. v. M/V Tequila* (2d Cir.1973) 480 F.2d 1024, in which a United States plaintiff claimed the breach of a contract that specifically provided that the law of New York would govern, and argued for application of the law of the flag (England) in order to get the benefit of its maritime lien law.

**22.** Although plaintiff argues that Nilsson's issuance of safety certificates on June 14, 1984 without the ship having been taken into class is an *ultra vires* act, it seems to us that it was an oversight that was cured by the belated issuance on June 21 (backdated to June 14) of the necessary classification certificate, more than a week before the June 29 casualty. Moreover, it is nowhere suggested that this assertedly improper issuance in any way harmed plaintiff.

respondeat superior, defendant is entitled to interpose the particular defense possessed by the individual employee(s) for whose acts it is being sued.

Mr. Scott responded forcefully to the first of these positions. Although we are not without reservations, he has persuaded us that as a matter of statutory construction the word "person" as it appears in § 279 does not include within its meaning classification societies such as defendant. Section 66 of the Act sets forth the manner in which the Bahamas empowers surveyors to act on its behalf:

(1) The Minister may *appoint,* in any port of place within or without the Bahamas, duly qualified persons to be surveyors ...

(2) The Minister may, by regulations, *nominate* any corporation or society within or without the Bahamas to be a Classification Society for the purposes of this Act,[23] and any Classification Society may *authorize* any person to survey and measure ships under and for the purpose of this Act. (Emphasis added).

A comparison of §§ 66 and 279 shows that the Parliament was specific in its application of the three particular verbs of empowerment it used—"appoint," "authorize," and "nominate"—to the entity empowered by the particular verb selected.

Thus the description of "classification society" in § 2 of the Act is "a society *nominated* as such under" § 66(2), while a "surveyor" is described as "a person *appointed* or *authorized* under" either subsection of § 66. Were the Parliament using "person" as broadly as defined in the Interpretation and General Clauses Act, there would appear to have been little need to distinguish in § 279 between "every Officer appointed" and "every person appointed or authorized," as the word "person" in the latter phrase would obviously include any "officer" in the former. Moreover, were a classification society a "person" in § 279, the use of the word "nominate" rather than "appoint" or "authorize" in § 66 would make little sense. Finally, § 279 twice employs the pronoun "him," but never the neuter "it."[24] Thus we are constrained to conclude that the only persons referred to in § 279 are those *appointed* (by the Minister pursuant to § 66(1)) or *authorized* (by a classification society pursuant to § 66(2)), but not a corporate "person" *nominated* pursuant to § 66(2).[25]

With this in mind we turn to respondeat superior, Sir Leonard's second ground for defendant's immunity under the Act. As Sir Leonard observed in his testimony, he had not fully developed this ground—but only "hinted" at it (Tr. at 252) in the formal

---

**23.** The Minister so nominated six societies (including defendant) in Merchant Shipping Regulation 3.

**24.** We requested the parties to inquire of Sir Leonard and Mr. Scott "whether or not Bahamian law has any ... statutory provision, or common law doctrine or understanding" comparable to § 22 of the New York General Construction Law, which before it was amended in 1981 provided as follows:

Words of the masculine gender include the feminine and the neuter, and may refer to a corporation, or to board or other body or assemblage of persons; and when the sense so indicates, words of the neuter gender may refer to any gender.

The responses, as we have come to expect and appreciate, were eloquent and erudite. However, although Sir Leonard provided us with numerous instances in the Act in which the masculine pronoun could include the neuter, and several in which it must do so, we agree, in the context of §§ 66 and 279, with Mr. Scott's reliance on "accepted canons of linguistic construc-

tion" and his resulting conclusion that "him" does not include a "classification society." *See* Scott letter of May 4, 1992; Knowles Aff. of May 4, 1992.

**25.** We were nonetheless struck at the April 23 hearing by defendant's presentation of four letters addressed to it and signed by one Captain A.L. Morris, the Director of Maritime Affairs for the Bahamas, and a person presumably intimately familiar with the Act. In three of the letters Capt. Morris referred to defendant's *authorization* to survey ships and issue SOLAS and other statutory certificates on behalf of the Bahamas. PTO Exhs. 174, 176, 178. In the fourth, he draws defendant's attention to § 65 (now § 66) of the Act, "under which your society has been *appointed."* PTO Exh. 177. While Mr. Scott is undoubtedly correct that Captain Morris is not a lawyer, and that lawyers and courts performing statutory construction take a different approach to specificity of language than do lay persons (Tr. at 317–18), the letters do suggest that an official policy may exist that is not perfectly reflected by the statute's language.

affidavits he had previously submitted. It is therefore not surprising that Mr. Scott's affidavit did not mention it. However, although plaintiff's counsel cross-examined Sir Leonard on this subject, he never mentioned it in his examination of Mr. Scott who, accordingly, did not express any relevant opinion he may have entertained.

We find that Sir Leonard's resulting uncontradicted opinion is fortified by the underlying considerations of public policy that gave rise to the Parliamentary conclusion that some immunity should be provided. Sir Leonard and Mr. Scott were in substantial accord as to these public policies. In this connection, Sir Leonard considered the immunity in § 279 to be part of the Bahamas' overall plan to encourage first-rate classification societies to issue certificates on its behalf. Thus he stated in his Feb. 25, 1992 affidavit at ¶ 12:

> the desire of the Government to encourage shipowners to register ships in The Bahamas, by nominating as surveyors the leading Classification Societies of the shipping world, thus indicating that its standards were high, and that the Bahamian Flag was not to be a "flag of convenience."

Mr. Scott did not take issue with this statement, but thought that Sir Leonard's interpretation of § 279 was too broad in that the Parliamentary purpose was only "to protect those persons who act as agents of the Bahamas government in the performance of functions and duties assigned to them under the act," whereas Sir Leonard's interpretation might immunize classification societies when "carrying out other services" (Tr. at 307).[26] Sir Leonard's second ground (respondeat superior) obviates this concern. Under that theory, immunity only arises when the employee whose conduct is claimed to have caused an injury had been specifically *authorized* by the classification society employer to perform specified services on behalf of the Bahamian government.

We also find Sir Leonard's opinion on Bahamian law to be supported by general principles of agency law. There concededly being no Bahamian cases on point, we follow Mr. Scott's advice and turn for guidance to the law of the United Kingdom, the "mother country" (Tr. at 299). Our research reveals that *Broom v. Morgan* [1953] 1 All ER 849, *affirming* [1952] 2 All ER 1007 is the seminal United Kingdom appellate case dealing with a master's (employer's) right to invoke an immunity of his servant ... In that case a husband and wife were employed by the owner of the "Bird in Hand" tavern. The wife was injured when she fell down a hatchway the husband had negligently left uncovered. The question presented was whether the wife could recover against the tavern owner on the theory of respondeat superior despite the fact that she was disabled from suing her husband because of interspousal immunity. In answering this question in the affirmative the Court of Appeal—as had the *nisi prius* court from which the appeal had been taken—relied heavily on Chief Judge Cardozo's opinion in *Schubert v. August Schubert Wagon Co.* (1928) 249 N.Y. 253, 164 N.E. 42, which happens to be one of the seminal cases establishing U.S. law in this area. Chief Judge Cardozo observed (249 N.Y. at 256, 164 N.E. 42):

> An employer commits a trespass by the hand of his servant upon the person of another. The act, let it be assumed, is within the scope either of an express mandate or of an implied one. In either event, if the trespass is not justified, he is brought under a distinct and independent liability, a liability all his own.... Illegality established, liability ensues. The defendant, to make out a defense, is thus driven to maintain that the act, however, negligent, was none the less lawful because committed by a husband upon the person of his wife. This is to pervert the meaning and effect of the disability that has its origin in marital identity.

---

**26.** Mr. Scott's precise testimony in this regard was: "my view is that the intention of the section really is to protect those persons who act as agents of the Bahamas government in the performance of functions and duties assigned to them under the act. It's not intended to protect independent third parties or entities carrying out other services" (Tr. at 307); and that "the statute is there to protect the Bahamas government" (Tr. at 323).

A trespass, negligent or willful, upon the person of a wife, does not cease to be an unlawful act, though the law exempts the husband from liability for the damage. Others may not hide behind the skirts of his immunity. The trespass may be a crime for which even a husband may be punished, but, whether criminal or not, unlawful it remains.

In that regard Chief Judge Cardozo compared the situation before him to that in *New Orleans & N.E. RR Co. v. Jopes* (1891) 142 U.S. 18, 12 S.Ct. 109, 35 L.Ed. 919, where the employee's act that caused the alleged injury was found to be "lawful" and the employer therefore not liable under the doctrine of respondeat superior. In the *Jopes* case a conductor employed by the railroad had shot a passenger, who was suing the railroad for the resulting injury. The railroad asserted that the passenger had started the ruckus (by approaching the conductor in a threatening manner with an open knife in his hand) and that the conductor had acted in self defense when he drew his pistol and shot the passenger. The trial court had charged the jury that this defense would only be available if the conductor had been in "actual" danger, and that the conductor's reasonable apprehension of danger would not suffice. 142 U.S. at 23, 12 S.Ct. at 111. The Supreme Court held this to be error, observing that if the railroad could establish that its employee had had a common law defense of self-defense his action would have been "lawful" and the company could avail itself of such defense.

The basic principle established by Chief Judge Cardozo's opinion was adopted by the American Law Institute in its Restatement of the Law of Agency (1933), which now appears as Restatement (2d) Agency § 217. So far as here relevant, that section provides:

In an action against a principal based on the conduct of a servant in the course of employment:

> (a) The principal has a defense if:
>
> . . .
>
> (iii) the agent had a privilege which he properly exercised on his principal's behalf . . .

On the other hand:

> (b) The Principal has no defense because of the fact that:
>
> . . . . .
>
> (ii) the agent had an immunity from civil liability as to the act.

The innumerable authorities listed in the Citations to the First and Second Restatement under § 217 can best be summarized as follows: where the agent has an immunity from civil liability dependent on his or her peculiar status (as for example a family relationship to the injured party, official immunity of some sort or other, infancy, incompetence, etc.) subsection (b) applies and the principal *cannot* avail itself of its agent's defense. On the other hand, if the immunity arises out of the doing of the act itself (regardless of any peculiar quality of the actor), subsection (a) applies and the principal *can* avail itself of the defense.[27]

In the case before us the immunity is provided to any person (regardless of any personal characteristic or status) whom a nominated classification society *authorizes* to do one of the specific acts for which the statute (§ 279) provides immunity. It would be hard to imagine a situation where the agent more clearly had "a privilege which he properly exercised on his principal's behalf," and we accordingly agree with Sir Leonard that upon the facts before us defendant is entitled to assert the defense that § 279 provides to its employee on the doctrine of respondeat superior.[28]

---

**27.** *See also Norton v. United States* (4th Cir. 1978) 581 F.2d 390, 397 n. 13: ("employers are generally entitled under traditional principles of *respondeat superior* to assert all defenses available to their employees") (*citing* Restatement (2d) Agency § 219, Comment c). In so holding the court essentially distinguished the quality of an act that creates a § 217(a) defense, which extends to the principal, from the status of the actor who has a § 217(b) immunity, which does not so extend, on the basis of the public policy goals that undergird the employee's asserted immunity with respect to the disputed act.

**28.** Plaintiff has several times urged that the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* bars defendant from using § 279 immunity. *See* Pl.Suppl.Mem. at 18, Pl.

Our conclusion that defendant can raise the shield of § 279 immunity with respect to good faith acts in issuing statutory safety certificates on behalf of the Bahamas raises the question of whether this case involves only claims in the issuance of those safety certificates, or also in issuing the classification certificate, which would not be within the protection of that section. It appears to us that while the complaint does assert negligence in the issuing of all certificates, the whole thrust of this litigation has been addressed exclusively to the protected statutory safety certificates.

Thus plaintiff's assertions at oral argument were specifically centered on its claim with respect to the issuance of the SOLAS certificate. Counsel for plaintiff stated that "[t]he law we are going under is the Safety of Life at Sea 1974. It is a very specific certificate, the passenger ship's safety certificate ... It's the issuance of that certificate ... not the Load Lines certificate by ABS per se that leads to the loss of the vessel" (Tr. at 17). And "the Safety of Life at Sea 1974. That's what applies in this case. This has to apply in this case" (Tr. at 33). And, with respect to defendant's control over the vessel, "look, there's those two holes, they can't be here, that ship can't sail, I have the passenger ship's safety certificate in my back pocket and I'll be damned if I am going to issue it" (Tr. at 86). And "[t]he Sundancer founders and sank because of progressive flooding because she did not meet the requirements of the Safety of Life at Sea Convention" (Tr. at 88). Moreover, counsel for plaintiff appears to have acquiesced in two statements counsel for defendant made in this regard: "[t]he essence of his case comes down to a charge that when ABS issued statutory safety certificates under the Safety of Life at Sea Convention, it did so negligently, even grossly negligent" (Tr. at 22); and "[w]e also undertook, also at the behest of owners, the statutory certificate work. And there we have to put some special emphasis, because we don't have a

Opp.Mem. at 95–97. We find this argument to be without merit. Defendant does not here seek to be treated as an instrumentality of the Bahamas government, but argues that Bahamian law

claim under the classification side of our work, we have a claim that is focused on allegations of negligence in the issuance of statutory certificates" (Tr. at 24–25). It therefore seems to us that we are concerned here only with the statutory SOLAS certificates.

## CONCLUSION

We grant defendant's motion for summary judgment and direct the clerk to enter an order dismissing the complaint. However, although a pre-trial order has been submitted and the parties have advised us that all discovery is complete, we wish to afford plaintiff an opportunity to consider whether anything contained in this opinion would legitimately entitle it to further discovery—but not a general reopening of discovery—in order (a) to persuade us that we are mistaken in any aspect of this opinion or (b) to complete the record for an appeal.

We therefore direct the Clerk of the Court to withhold entry of judgment until further order. Within 20 days plaintiff may submit a motion for reargument and/or an application for further discovery within the above narrow bounds. Should plaintiff make such an application, it must specify how it expects the requested discovery to further either or both of the above-stated objectives, and explain why such discovery had not been taken before the pre-trial order was filed. In the event plaintiff makes either such motion or application, defendant shall have 20 days to respond. Should oral argument seem appropriate it will be heard on Friday September 18 at 2:00 p.m. Should plaintiff prefer an immediate appeal on the present record, it may file with the Clerk of the Court a notice so advising him and a judgment dismissing the complaint will be entered forthwith.

SO ORDERED.

should govern this litigation, and that § 279 of the Act provides it with a limited immunity under such law.

## ON MOTION FOR REARGUMENT

We have before us plaintiff's affidavit and attached exhibits submitted to complete the record in accordance with the permission granted in our July 31 Opinion and Order. We construe this affidavit as a motion for reargument. Plaintiff identifies three specific errors it considers appropriate for reconsideration. We address them in turn.

1. At page 392 of our Opinion, we referred to statements made by plaintiff's counsel that led us to conclude that, for all practical purposes, they had abandoned any claim based on possible errors by defendant in the issuance of the *classification* certificate. Plaintiff now submits pages extracted from its various briefs and affidavits to establish that such claim was not technically abandoned. We agree that these pages do establish that proposition. However, plaintiff does not call our attention to any evidence—and we know of none—suggesting that it was in any way damaged by possible errors in issuing that particular certificate. Summary Judgment should not be denied because of the theoretical possibility of an issue of fact. *See Delaware & Hudson Railway v. Consolidated Rail Corp.* (2d Cir.1990) 902 F.2d 174, 178 ("Conclusory allegations will not suffice to create a genuine issue. There must be more than ... 'some metaphysical doubt as to the material facts.'") (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538).

2. With respect to the respondeat superior aspect of Part (4) of our Opinion treating defendant's claimed immunity under Bahamas law, we have carefully considered the views expressed in the affidavit of Mr. Scott now submitted by plaintiff. It is, in the first place, difficult to understand why plaintiff's counsel did not elicit these views at the April 23 hearing when Mr. Scott was on the witness stand and Sir Leonard was available either to rebut his views or to assist defense counsel in cross-examining him. Be that as it may, the affidavit does not persuade us that Sir Leonard's testimony was not reliable, or that we committed error in accepting it.

3. At page 386 of our Opinion we characterized as "frivolous" plaintiff's contention that the invoices sent to it by defendant had modified the Agreement between the parties. We adhere to that characterization. At page 2 of the affidavit now submitted by its counsel, plaintiff asserts:

> That he [Sjogren] could not remember the details of those terms when he testified eight years later is *not* evidence that he was not aware what they were at the time he reviewed them. (Emphasis in original).

Plaintiff seems to overlook the fact that, having originally established the existence of the Agreement between the parties, it has the burden of persuading us that it was subsequently modified. *See Delaware*, 902 F.2d at 177–78 ("The non-movant, however, who must sustain the ultimate burden of proof, must demonstrate in opposing a summary judgment motion that there is some evidence which would create a genuine issue of material fact."). What actually occurred during the Sjogren deposition (which was offered on plaintiff's behalf) is that counsel doggedly attempted by long and torturous examination with leading questions to induce him to say something from which an intent to modify the Agreement could be inferred. He succeeded only in getting Sjogren to volunteer that the "terms and conditions" of the invoices in question "are more or less the same terms and conditions for the [original] contract."

We accordingly deny plaintiff's motion for reargument, and direct the Clerk to enter judgment dismissing the complaint.

SO ORDERED.